Edward Richard CHILDS, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

Aug. 6, 1979.

Joe B. Jones, Memphis, for petitioner.

Robert A. Grunow, Asst. Atty. Gen., Nashville, for respondent; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

## OPINION

HARBISON, Justice.

Petitioner was convicted of murder in the second degree and sentenced to serve thirty years and one day in the state penitentiary. His conviction was affirmed by the Court of Criminal Appeals.

We granted certiorari to consider the admissibility of statements made by petitioner and of evidence discovered as a result thereof. As the case comes to this Court, these are the only questions presented, there being no challenge to the sufficiency of the evidence.

Charges against petitioner resulted from the homicide of Claudette Williams on Monday, April 4, 1977. Her body was not discovered until Wednesday, April 6 when a concerned relative went to her apartment. Her death was caused by manual strangulation. A stereo record player, some jewelry, a fur coat and other items of personal property were missing from the apartment. Descriptions of these were given to the police by a relative of decedent.

There were no immediate suspects known to the police or to relatives and friends of decedent. She lived alone in her apartment and had resided there only a short time. She was known to have been seen socially with several different persons. Photographs and names of a number of men were found in the apartment. Police began an extensive investigation into the homicide. Among those interviewed by them was Bessie Anderson, the sixteen-year-old daughter of a friend of the decedent. She told police that the deceased had stopped briefly at the home of the witness on the evening of April 4, 1977, accompanied by a male companion. Another friend of decedent told the police that decedent had a new boyfriend whose name she thought was "Giles." It was her understanding that the two had met in a bowling alley. Upon further investigation of decedent's apartment, the police found in a waste basket a piece of paper bearing the name "Eddie Childs" and a telephone number. The number was that of one Pat Brunson, with whom petitioner was then living. Police contacted petitioner at that telephone number and requested that he come to police headquarters for questioning. Petitioner did so but found when he arrived that the officers in charge of the investigation were in Mississippi interviewing two other persons previously associated with the decedent. Accordingly the peti-

tioner was not questioned on that occasion and was not contacted again by the police for some time.

Following all possible leads, the police officers interviewed Ms. Brunson with whom petitioner was living and learned from her that he had done some volunteer work for a Boy Scout program. They also learned that he was working at a truck delivery service. Upon contacting the employer, however, they discovered that petitioner was using the name of Eddie Woods; apparently he used the name Childs in his Boy Scout work.

On the evening of April 13, 1977, approximately nine days after the homicide, Sergeants East and Wilson of the Memphis Homicide Division met petitioner and Ms. Brunson at the latter's apartment upon their return from work. They identified themselves to petitioner and requested him to enter the police car so that they could question him.

At no time during the development of the trial record, either during a suppression hearing or before the jury, did the petitioner testify or call any witnesses.[1] Accordingly, the only evidence as to what occurred during the next several hours is the testimony of police officers, which was not impeached in any manner. Sergeant Wilson was not called as a witness by either side. The only evidence concerning the initial questioning of petitioner was that given by Sergeant East.

According to his testimony, petitioner voluntarily entered the police vehicle. He admitted knowing the decedent but inquired as to why he was being questioned. Sergeant East testified:

"We told him we were investigating a criminal homicide of Claudette Williams. And that we wanted to talk to him because we found his name and phone number in a garbage sack, in a garbage can in her apartment. And told him that we talked to everybody whose names come up in the investigation."

Petitioner told the officers that he sometimes used an alias and that he had previously served a prison term following a forgery conviction under the name "William Turner."

The officers then asked petitioner for some identification. He requested Ms. Brunson to bring his billfold to the police car and handed it to Sergeant East. East took the wallet into the front seat and took out a Boy Scout card to copy information from it. When he removed this card, he discovered a small piece of yellow paper beneath it. He recognized this as a pawn ticket, which he then removed from the billfold and found thereon the name "Eddie Woods" with the notation that an Olympic record player and speakers had been pawned for $50.00 on April 7, 1977. The address on the pawn ticket was not the address at which petitioner was being questioned, nor was there any identification of the property pawned to connect it with the decedent.

Petitioner admitted to the officers that he had used the name Woods previously, and they asked him if he had any further identification showing that name. He stated that he did and accompanied the officers into his apartment where he produced a driver's license issued in that name. Sergeant East then testified.

"We asked Mr. Childs if he would go downtown so that we might talk to him further about it and get his fingerprints and photograph so we could find out who he was. He had three names. He agreed to do so and we got in the car and drove down to headquarters."

The interview with petitioner at the police car began at about 5:15 p. m. and lasted some fifteen or twenty minutes. At that time Sergeant East testified that he considered the petitioner a possible witness, but not yet a suspect, and at that stage the interview was simply part of the general investigation being conducted into the homicide. He testified:

---

1. At the conclusion of the evidence petitioner did take the stand for the purpose of stating that his decision not to testify was voluntary.

"Anytime there's a homicide we talk to everyone that we can find that knows the victim, has ever known her, in any way. We try to talk to them; maybe they have seen her. We try to establish the last time she was seen alive and of course we do that by talking to people that she knows and knows her that might have seen her at a club or might have seen her someplace."

At that time, the investigation involved the names of some five or six men whom the victim had known, and the officers were gathering information concerning all of them.

Both Sergeant East and other police officers who testified stated that the petitioner was cooperative at all times. East said that he readily agreed to go to the police station. As previously noted, this testimony is unrebutted and uncontradicted.

Arriving at the police station about six o'clock, petitioner accompanied East and Wilson to a room in the homicide office where he was questioned further. The only information given by him at that time was exculpatory. Petitioner told the officers that he had never dated the deceased, that he knew her only casually, having met her at a bowling alley, and that he had never been to her apartment or to the apartment complex where Bessie Anderson lived and where decedent was last seen on the evening of April 4.

Sergeant East testified that the investigation into the death of Ms. Williams was being coordinated under Sergeant Hester of the Homicide Division. When petitioner arrived at police headquarters, Sergeant Hester was notified and said that he would check police records concerning him. Petitioner had been questioned for a few minutes when Hester came to the door and advised Sergeant East that petitioner's fingerprints had been found to match some prints taken in the victim's apartment and also that an outstanding arrest warrant had been discovered in which petitioner was charged with forgery. This occurred at about 6:30 p. m. Petitioner was immediately placed under arrest and given *Miranda* warnings.

Subsequently, during the evening, petitioner made both an oral and a written confession to the homicide, stating that he had met the victim at a bowling alley, had later sold her some marijuana for which she did not pay, and that in a struggle in her apartment he had put his arm around her neck and knocked her to the floor. He said that he did not know that she was dead when he left her apartment. He admitted burglarizing the apartment and taking several items for the purpose of paying the persons who had supplied him with marijuana.

Subsequent investigation confirmed that petitioner had pawned a stereo record player, and this was identified as being the property of decedent. A thumbprint of the person pawning the property, taken at the pawn shop, matched the print of petitioner. Other witnesses at the trial testified that petitioner had admitted knowing the decedent and that he had exhibited to them some of the property which was taken from her apartment.

Petitioner challenges the admissibility of the statements which he gave to the police on the grounds that they resulted from an illegal arrest or detention and also that they resulted from a custodial interrogation occurring after suspicion had been focused upon him, in violation of the rules laid down in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The trial judge conducted a lengthy jury-out hearing and found that there had been neither an illegal arrest nor any violation of petitioner's constitutional rights prior to the time he was formally arrested and charged. The Court of Criminal Appeals concurred in these findings.

These issues, of course, are primarily factual in nature. We have carefully reviewed the record and conclude that the findings of the courts below are supported by material evidence and that there is no countervailing or contradictory proof which might be said to preponderate against them.

We recognize that the United States Supreme Court, both in the case of *Brown v.*

*Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and in the very recent decision of *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), has held that compliance with the requirements of *Miranda v. Arizona* and the protection of the Fifth Amendment rights of an accused do not necessarily afford sufficient protection against invasion of Fourth Amendment rights involving illegal arrest and detention. In the *Dunaway* case, the Court held that a statement which complied with the *Miranda* requirements was nevertheless inadmissible when it resulted from an illegal detention or arrest without probable cause.

The facts of that case, however, were quite different from those of the present case. There a juvenile was picked up on orders of a detective and brought to police headquarters for interrogation, although it was conceded that there was no probable cause for his arrest at that time. Although he was given *Miranda* warnings, his unlawful arrest and custodial interrogation were held to render inadmissible some incriminating statements and other information given by him.

In the case of *State v. Chandler,* 547 S.W.2d 918 (Tenn.1977), this Court considered in detail the decision in *Brown v. Illinois, supra,* noting that in addition to *Miranda* warnings, additional factors must be considered in determining the admissibility of a statement under both the Fourth and Fifth Amendments. There the Court said:

"The additional factors are:

"(1) The length of time between the arrest and the time the confession was made;

"(2) The presence of intervening events between the arrest and confession, such as arraignment;

"(3) The purpose and flagrancy of the official misconduct."

547 S.W.2d at 920.

In the present case, it is clear that the petitioner had on one occasion, prior to the night when he was arrested, gone voluntarily to police headquarters in response to a telephone call, in order to submit to questioning. On the night of April 13 he was questioned by police at the place where he was living and then agreed to go with them at their request.

When petitioner was taken to the police station, the officers had general information that he was acquainted with the decedent. In addition they knew that he had been using three different names, that he had pawned a stereo unit, and that a stereo record player had been stolen from the decedent's apartment. Whether there was any similarity between the unit pawned and the missing one, however, was by no means established. Petitioner denied having ever been with the decedent to her apartment or to the apartment building where Bessie Jackson lived, so the officers had no knowledge of any relationship between him and the decedent, except his statement that he had met her and their finding of his name in her apartment. While a number of photographs of young men had been found in her apartment, none of these was shown to have been a photograph of the decedent. The names of five or six other men had been found, and investigation was proceeding as to all of these.

While counsel for petitioner argued at the trial and argues here that Sergeant East was not a credible witness and that the petitioner was involuntarily detained, not free to leave the officers' presence and in fact actually under arrest, these are factual issues to be determined from all of the circumstances. In the absence of any countervailing evidence whatever, and in view of the fact that both the trial and intermediate appellate courts have accredited the testimony of the police officers, we are unable to sustain the contention of petitioner that his initial questioning, either at the apartment or at the police station, amounted to anything more than general inquiry or investigation or that it constituted an unlawful arrest or illegal detention.

Not until the police learned that petitioner's fingerprints matched some of those which had been found in the decedent's apartment did they clearly have probable

cause to suspect him of the homicide. At that time, they immediately placed him under arrest and gave full *Miranda* warnings. There is no evidence that the statements thereafter given by him were the result of duress or coercion. The uncontradicted testimony is that after petitioner was arrested, he saw another police officer, Sergeant Burgess, in the station and asked to talk to him. He gave this officer incriminating information and later in the evening signed a written statement which implicated him in the homicide.

In the case of *State v. Morris,* 224 Tenn. 437, 456 S.W.2d 840 (1969), this Court discussed the implications of *Miranda v. Arizona, supra,* and the factors to be considered in determining whether the police had proceeded beyond an investigatory stage into an accusatory or custodial stage when questioning an accused.[2] There a statement had been taken from the defendant following an automobile accident in which a fatality occurred. Defendant sought to suppress the statement at trial. Discussing his contention the Court said:

> "The question presented to us is as heretofore stated, were Morris' rights under *Miranda* violated, and was he denied the protection extended by the Constitution of the United States?
>
> "The police officer testified that he was investigating this accident; that Morris was not in custody; that the statements made by Morris were freely and voluntarily made. That, in effect, he was acting in an investigatorial capacity, and that the finger of suspicion had not as of then been pointed to Morris as a suspect; that no warrant had been sworn out against him.
>
> "We realize that there is a hairline of distinction between the investigatory stage and the accusatory or custodial stage. A careful examination of many decisions construing *Miranda* indicates to us that the courts have generally con-

sidered the totality of the circumstances in deciding whether the suspect was subjected to 'custodial interrogation' requiring *Miranda* warnings.

> "The rules with reference to such questions are laid down under the following general headings:
>
> 1. The nature of the interrogator.
> 2. The nature of the suspect.
> 3. The time and place of the interrogation.
> 4. The nature of the interrogation.
> 5. The progress of the investigation at the time of the interrogation."

224 Tenn. at 442–43, 456 S.W.2d at 842.

The Court concluded that each case must be controlled by its own facts and that all of the circumstances must be taken into consideration. In view of the fact that the trial court sees and hears the witnesses and is in a superior position to that of the appellate courts in determining their credibility, the Court concluded that the trial judge should be permitted wide discretion in deciding the factual issues presented and that appellate courts should not intervene unless it clearly appeared that there had been an abuse of discretion and a violation of the rights of the accused. For authorities from other states on the subject of custodial interrogation, see Annot., 31 A.L. R.3d 565 (1970).

◼ The factual issues presented in the present case are, arguably, close, and differing conclusions or inferences might be drawn from them by a trier of fact. Not all interrogation in a police vehicle or at a police station is "custodial" within the meaning of the *Miranda* decision,[3] and certainly not all such interrogations are the result of illegal arrests or unlawful detentions. Obviously, had petitioner been questioned on the first occasion when he went to police headquarters in response to a telephone call, it could hardly have been contended that he was the victim of an illegal

---

**2.** *See also Vandergriff v. State,* 219 Tenn. 302, 409 S.W.2d 370 (1966); *Underwood v. State,* 465 S.W.2d 884 (Tenn.Cr.App.1970).

**3.** *See Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *State v. Bohanan,* 220 Kan. 121, 551 P.2d 828 (1976); *State v. Inman,* 350 A.2d 582 (Me.1976).

arrest. The fact that he had made such a voluntary appearance on a previous occasion lends some credence to the testimony of Sergeant East that he accompanied the police voluntarily on the evening of April 13.

In the present case it seems clear that until the officers had obtained the pawn ticket from the petitioner, there was no custodial interrogation of any sort. There was only brief general questioning in the police car, and the investigation certainly had not focused upon petitioner, who was then considered only a possible witness.

By the time the pawn ticket was discovered, the police knew that petitioner had been using more than one alias and that he had pawned a stereo unit on the day after the body of the deceased was discovered, which was three days after the date of the homicide. It is contended that at this point the investigation did begin to center on the accused, and that he was not then free to walk away from the interrogation. However, there was no testimony to that effect, nor was the question even asked. The only evidence in the record is that the accused cooperated readily with the police and voluntarily accompanied them to the station.

Petitioner was not questioned more than a few minutes in the police station before being formally arrested and charged. During that interval he gave information which indicated only that he had met the deceased at a bowling alley, but at this time he denied having ever been in her apartment or having any close association with her.

If custodial interrogation could be said to have begun at that point, it was almost simultaneously that the police learned that the fingerprints of the accused had been found in the victim's apartment. He was thereupon arrested and given *Miranda* warnings.

 We are of the opinion that the evidence supports the conclusions of the courts below that the investigation in this case did not shift from general to custodial until petitioner was actually arrested and given *Miranda* warnings. Even if a contrary con-

clusion could be sustained, petitioner's subsequent confessions would not necessarily be tainted and rendered inadmissible under the circumstances shown here. If anything had occurred which might have "let the cat out of the bag" prior to the time when petitioner was formally arrested, it was the discovery of the pawn ticket in his possession, not the later interrogation and exculpatory information which he had given. The pawn ticket itself, however, as we have already noted, did not contain petitioner's current address nor did it contain any information suggesting that the items pawned belonged to the decedent.

After carefully considering the assignments of error, we are of the opinion that the oral and written statements given to the police by petitioner were not the result of improper detention, unlawful arrest or improper custodial interrogation. The assignments of error are overruled, and the judgment of the Court of Criminal Appeals is affirmed at the cost of petitioner.

BROCK, C. J. and HENRY, COOPER and FONES, JJ., concur.