**STATE of Tennessee, Appellee,**

v.

**Richard L. DARNELL, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

March 2, 1995.

Permission to Appeal Dismissed by Supreme Court July 10, 1995.

Jeffrey A. DeVasher, David M. Siegel, Senior Assistant Public Defenders, Nashville, for appellant.

Charles W. Burson, Attorney General and Reporter, Cecil H. Ross, Assistant Attorney General, Victor S. Johnson, District Attorney General, Roger Moore, Dan Hamm, Assistant District Attorneys General, Nashville, for appellee.

## OPINION

WELLES, Judge.

This is a direct appeal as of right from a conviction on a jury verdict of first degree murder. The trial court sentenced the Defendant to life in prison. We affirm in part and reverse in part the judgment of the trial court.

The Defendant argues two issues on appeal: (1) The trial court erred in denying the Defendant's motion to suppress his statements to the police, and (2) there was not sufficient evidence to find the Defendant guilty of first degree murder.

The victim was found dead in her home in Nashville, Tennessee on the evening of January 20, 1992. She was an elderly woman who lived by herself. She had been stabbed twice in the back, once in the neck and once in the abdomen. Her phone had been ripped off the wall. The police conducted an initial investigation during which they dusted the house for fingerprints.

Detective Pridemore, the officer in charge of the murder investigation, asked the family members for names of acquaintances of the family. The Defendant's name was among the names given. The department determined that the Defendant's fingerprints matched several prints at the crime scene. Two of Defendant's prints were found on the dresser next to the victim's body. Another print was found on the phone which had been pulled from the wall. Three prints were found on the toilet seat in the victim's bathroom.

Pridemore sought out the Defendant for questioning but had trouble locating him. On the evening of September 3, 1992, an unidentified woman stopped a K–9 officer on patrol, handed him Pridemore's business card, and told him the Defendant was walking across the Shelby Street bridge. The K–9 officer contacted Pridemore, who came to the scene to question the Defendant. The Defendant agreed to accompany Pridemore to his office for questioning. During questioning, the Defendant stated that he had not been in the victim's house for ten years. Pridemore told him he had evidence to the contrary. At this point, the Defendant said that he did not want to talk anymore. He demanded that Pridemore either arrest him

or let him go. Pridemore then arrested the Defendant.

## I.

The Defendant's first issue is whether the trial court erred in denying his motion to suppress his statements to the police. The Defendant divides this issue into three arguments. The first argument is that the Defendant was illegally seized on the street because there was not probable cause to stop him. The second argument is that the Defendant's initial statements were made during custodial interrogation before he was given the warnings set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *reh'g denied* 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966). The third argument is that his post-*Miranda* statements should have been suppressed because under the totality of the circumstances his waiver cannot be found to be voluntary.

## A.

Officer Edward Ryan of the K–9 division of the Metro Police Department was on patrol the night of September 3, 1992. While on patrol, a woman flagged him down, handed him the business card of Detective Pridemore and said that the detective was looking for the Defendant. She said that Pridemore told her to call him if she saw the Defendant. Ryan had not seen the woman before this encounter and did not have any background information on her. She then gave him a physical description of the Defendant, and said the Defendant and his friends were heading across the Shelby Street Bridge.

Ryan then drove across the bridge, located the Defendant and his friends, stopped them, and said he needed to talk to them a minute. It is unclear from the record whether he used his flashing lights to stop them. He then asked the individuals their names, and the Defendant identified himself. Ryan then contacted the Homicide department. He asked the dispatcher if Pridemore was looking for the Defendant. The dispatcher replied a few minutes later, stating that Pridemore was looking for the Defendant and that he was on his way.

Ryan told the Defendant's friends that they were free to leave. Ryan then told the Defendant that the detective wanted to speak with him, and that the detective was on his way. He asked if he would mind waiting for the detective to get there, and the defendant said that he did not mind. Ryan patted down the Defendant for his protection, as was usual procedure when detaining someone, even for a brief period of time. The Defendant leaned against the front quarter panel of Ryan's car while waiting for the detective to get there. Another officer drove by and saw Ryan and stopped to talk to him while Ryan waited for Pridemore. Pridemore arrived about thirty minutes later.

When Pridemore arrived and introduced himself it was 12:30 a.m. He asked the Defendant if he would mind going to the office at the police station or somewhere else to talk about the case. The Defendant said he would not mind going to Pridemore's office and also agreed to ride in the car with Pridemore. The Defendant rode in the passenger's side of Pridemore's car, as opposed to the rear compartment.

The Defendant argues that his stop by Officer Ryan and wait for Detective Pridemore was an illegal seizure under the Fourth Amendment, and his later statements should therefore be suppressed. We must first determine if the detention amounted to a Fourth Amendment seizure. If the detention was a seizure under the Fourth Amendment, we must then determine whether the officer possessed an articulable reasonable suspicion for an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and the seizure cases following *Terry*. If so, the evidence obtained subsequent to the stop would be admissible at trial. If not, then the evidence should have been suppressed at trial. At the conclusion of the suppression hearing, the trial judge stated that she did not believe that the stop was a *Terry* stop, and therefore, did not reach the level of being a Fourth Amend-

ment seizure. She found "that it was a voluntary stop and a voluntary statement. . . ." We agree with the trial judge.

In *Terry*, the Supreme Court stated that not every encounter between a policeman and a citizen is a seizure. *Terry v. Ohio*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1878 n. 16. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* Subsequent to *Terry*, the United States Supreme Court has attempted to define what constitutes a seizure under the Fourth Amendment. In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1979), *reh'g denied*, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980), Justice Stewart, announcing the decision of the Court, stated, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877 (footnote omitted). However, due to the three way split among the justices *Mendenhall* was of limited authority.[1] This so called "reasonable man" standard was adopted, by a plurality decision,[2] in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1982). *Id.* at 502, 103 S.Ct. at 1326. In *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), a majority of the Court relied on the "reasonable man" standard for a seizure case.

What is apparent from *Royer* and *Brown* [*v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ] is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps—such as those taken in *Brown*—[in *Brown*, the police physically detained the Defendant after he refused to answer]—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.

*Delgado*, 466 U.S. at 216–17, 104 S.Ct. at 1762–63 (citations omitted). This test was also applied in *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1987).

█ In the case *sub judice*, the question becomes whether, in these particular circumstances, a reasonable person would have believed he was not free to leave. We believe that a reasonable person would have believed he was free to leave. Officer Ryan did not display any weapons and did not physically force the Defendant to stay. Rather, Ryan approached the Defendant and his friends, asked for their identity, then called the dispatcher to verify that Pridemore was looking for the Defendant. Upon verification, Ryan told the Defendant that Pridemore wanted to speak with him. Ryan then asked the Defendant if he would mind waiting for Pridemore. The Defendant consented to wait for Pridemore. He also consented to talk with

---

1. Justice Stewart wrote the judgment of the Court. Justice Rehnquist joined Justice Stewart, and was the only justice who supported the definition of seizure announced by Justice Stewart. Justice Powell wrote a concurring opinion to concur in every part except the definition of seizure. Chief Justice Burger and Justice Blackmun joined in this opinion. Justice White filed a dissenting opinion in which Justices Brennan, Marshall and Stevens joined.

2. Justice White wrote the opinion. Justices Marshall, Powell and Stevens joined his opinion. Justice Powell filed a concurring opinion, and Justice Brennan filed an opinion concurring in the result. Justice Blackmun filed a dissenting opinion, and Justice Rehnquist filed a dissenting opinion joined by Chief Justice Burger and Justice O'Connor.

Pridemore, as well as to go to the police station with Pridemore to talk there. There was no seizure. As stated above, the fact that Ryan or Pridemore did not inform the Defendant that he had the right to leave or to refuse to talk with Pridemore does not change the fact that there was no seizure. It was a consensual encounter. The Defendant could have refused at any time during his encounter with Ryan, and he could have refused during his subsequent encounter with Pridemore.

This issue is without merit.

### B.

The Defendant's second argument is that his initial statements were made during custodial interrogation before he was given his *Miranda* warnings, and therefore should have been suppressed at trial. The Defendant agreed to ride to the police station in the car with Pridemore. He was not handcuffed, and he rode in the front seat on the passenger's side. On the way to the station the two men talked, but nothing was said that dealt directly with the homicide.

At Pridemore's office, Pridemore told the Defendant that his name came up in an investigation he was working on. The Defendant asked who had given his name, and Pridemore told him Tracy Zimmerle Jessup, the victim's niece. The Defendant had had a relationship with Jessup at one time. The Defendant said that he had not seen her in ten years. Pridemore then stated that his name came up in connection with a situation in her family, and he asked the Defendant if he wanted to talk about it. The Defendant answered that he would, but he wanted to talk to his mother first. Pridemore gave the Defendant the phone. Both the Defendant and Pridemore explained the situation to the Defendant's mother. After the Defendant spoke with his mother, he indicated to Pridemore that he was still willing to talk to the detective. At this time, Pridemore advised the Defendant of his *Miranda* rights. The time period that the Defendant asserts was a custodial interrogation, in violation of his

constitutional rights, is when he rode with Pridemore to the police station and during initial questioning at the police station prior to the time that Pridemore gave the Defendant his *Miranda* rights. The trial judge, at the suppression hearing, ruled that any statements made during this time period would not be suppressed.

There is a "hairline of distinction" between the investigatory stage and the accusatory or custodial stage. *State v. Smith,* 868 S.W.2d 561, 570 (Tenn.1993); *Childs v. State,* 584 S.W.2d 783, 788 (Tenn.1979); *State v. Morris,* 224 Tenn. 437, 456 S.W.2d 840, 842 (1970). The deciding factor for whether an individual is in custody is whether the accused was "deprived of his freedom of action in any significant way," not the occurrence of the interrogation in a "coercive environment." *Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977). The definitive question in determining whether an individual is in custody for *Miranda* purposes is "whether there is a 'formal arrest or restraint of freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). The Tennessee Supreme Court has stated that we look to the totality of the circumstances by analyzing five areas:

1. The nature of the interrogator.

2. The nature of the suspect.

3. The time and place of the interrogation.

4. The nature of the interrogation.

5. The progress of the investigation at the time of the interrogation.

*Morris,* 456 S.W.2d at 842. This court is bound by the findings of fact of the lower court, when determining whether a defendant was in custody at the time of questioning, "unless it clearly appear[s] that there ha[s] been an abuse of discretion and a violation of the rights of the accused." *Childs,* 584 S.W.2d at 788; *e.g., Smith,* 868 S.W.2d at

570; *State v. Furlough,* 797 S.W.2d 631, 639 (Tenn.Crim.App.1990); *State v. Nakdimen,* 735 S.W.2d 799, 802 (Tenn.Crim.App.1987).

▮ We find there was no abuse of discretion on the trial judge's part in finding that the Defendant was not in custody so as to invoke *Miranda* warnings. The trial judge found that there was no basis to suppress the Defendant's statements. Under the standards set out in *Beheler* and *Mathiason,* the Defendant was not in custody during the time period before he was given Miranda warnings.

The Defendant was not deprived of his freedom of action. Also, there was no formal arrest or restraint of the Defendant's freedom of movement to the degree associated with a formal arrest. He agreed to go to the detective's office to be questioned. He rode in the front seat of the Defendant's unmarked police vehicle. He was not handcuffed. It was a voluntary encounter. In fact, before the Defendant was given his *Miranda* warnings, the detective did not ask the Defendant any questions related to the case. Rather, the Defendant asked who had mentioned his name and then asked to call his mother.

Under the totality of the circumstances test laid out in *Morris,* the trial judge ruled correctly. Pridemore was not coercive. He let the Defendant choose where he wanted to go for the questioning. Furthermore, Pridemore did not even ask questions dealing directly with the case until the Defendant had been given his *Miranda* warnings. The suspect was almost impossible to contact due to the fact that he lived on the streets. Pridemore had been trying to contact the Defendant for a few days. Pridemore spoke with the Defendant's mother and she indicated that the Defendant lived on the streets. Therefore, the immediate questioning of the Defendant, even at an odd hour, was warranted. At the time of the questioning, Pridemore had talked with hundreds of people. The victim's niece had given Pridemore the Defendant's name, and fingerprints at the murder site matched those of the Defen-

dant. It is obvious that Pridemore would want to speak with any individual whose fingerprints were at the murder scene.

The trial judge correctly decided that the statements obtained in the interrogation prior to the *Miranda* warnings were not given in custody. Therefore, the statements should not have been suppressed.

This issue is without merit.

## C.

The Defendant's third argument, stemming from his suppression hearing, is that his post-*Miranda* statements should have been suppressed because his waiver and continued statements could not be considered voluntary under the totality of the circumstances.

After the Defendant and Detective Pridemore spoke with the Defendant's mother, Pridemore told the Defendant that he was going to inform him of his *Miranda* warnings. The detective read the warnings to the Defendant, asking if he understood his rights after each sentence. Then the Defendant wanted to read the warnings himself to make sure Pridemore was not trying to trick him. The Defendant read the warnings, and Pridemore asked him again if he understood his rights. The Defendant said that he did. The Defendant then signed the waiver.

Following the signing of the waiver, the Defendant initiated a conversation about Jessup, the victim's niece. He asked Pridemore what she was accusing him of. He said "I didn't do anything. I'm a thief. All I do is steal and get high." The detective asked when was the last time he saw Jessup, and the Defendant replied that it had been about ten years ago. The defendant also stated that he had not seen her mother, the victim's sister, in about ten years. The detective then asked if he had seen any other members of Jessup's family. The Defendant replied that he had seen the victim about two years ago, while he was driving down the street going to "cop some dope." He honked his horn and waved at her.

The detective then asked the Defendant if he had ever been in the victim's house. The Defendant said, "I have never been in that woman's house. It's been ten years ago. Besides, when I was there, I was there with Tracy." The detective asked him if he remembered where in the house he was, and the Defendant replied that he could not remember because it was so long ago. The Defendant then started talking about the victim. Suddenly, the Defendant stated that she had died of a heart attack. He started elaborating, but as soon as he stated that she had died, he stopped mid-sentence and refused to talk about her anymore. The detective asked the Defendant if he was sure that she died from a heart attack, and the Defendant stated that he was sure, but he did not want to talk about that.

The detective then told the Defendant that the police had his fingerprints in the house, and that there is no way they could have remained there for ten years. The Defendant said that he did not want to talk about the victim anymore. The detective asked if they could talk about some things from earlier in the discussion. The Defendant then stated that he did not want to talk about it anymore and to either arrest him or let him go. The detective did not question the Defendant any further, and obtained a warrant for the Defendant's arrest for murder.

■ To be valid, a waiver must be made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. Whether a waiver has been made voluntarily, knowingly, and intelligently must be decided on the totality of the circumstances on a case-by-case basis. *State v. Benton*, 759 S.W.2d 427, 431–32 (Tenn.Crim.App.1988). The findings of the trial court will not be disturbed on review unless the evidence preponderates against those findings. *State v. Kelly*, 603 S.W.2d 726, 728–29 (Tenn.1980). The wisdom of the defendant deciding to make a statement and his or her failure to foresee the effects of that statement are not relevant to the determination of a valid waiver. *See Harris v. Riddle*, 551 F.2d 936, 939 (4th Cir.1977), *cert. denied*, 434 U.S. 849, 98 S.Ct. 160, 54 L.Ed.2d 118 (1977).

■ In the case *sub judice*, the evidence does not preponderate against the findings of the trial court. Nowhere in the record is there any evidence that the waiver was not made voluntarily, knowingly and intelligently. Pridemore read the Defendant his rights, asking him after each sentence if he understood them. Then the Defendant himself read the waiver, because he wanted to make sure the detective was not tricking him. He alone made the decision to sign the waiver.

This issue is without merit.

## II.

■ The Defendant's second issue is whether there was sufficient evidence to prove beyond a reasonable doubt that the Defendant was guilty of first degree murder. When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding of the trier of fact of guilt beyond a reasonable doubt." T.R.A.P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn.Crim.App.1990).

■ In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (Tenn.1956). This court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Herrod*, 754 S.W.2d 627, 632 (Tenn. Crim.App.1988).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn.Crim. App.1987). In *State v. Grace*, 493 S.W.2d 474 (Tenn.1973), the Tennessee Supreme Court said "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *Id.* at 476.

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, *id.*, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record and the inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. *Matthews*, 805 S.W.2d at 780.

### A.

The Defendant's first argument of insufficiency of the evidence is that the evidence was insufficient to prove that he was the perpetrator. The evidence in this case is circumstantial. The were no witnesses who placed the Defendant at or near the victim's house near the time of the murder. The evidence which connects the Defendant with the crime is the presence of his fingerprints at the murder scene and his statement to Detective Pridemore that he had not been in the victim's house in ten years. The Defendant's fingerprints were found in three separate areas of the victim's house. Six identifiable fingerprints of the Defendant were found. Two prints were found from the top of the chest of drawers next to the victim's body. Three prints were found on the commode ring in her bathroom. One print was found on a phone which had been forcibly removed from the wall.

The expert on fingerprint analysis testified at trial that fingerprints on a non-porous surface, such as glass, will last a month to six weeks under optimum conditions. He also stated that a print on a surface that is used often is very unlikely to last a long time. In the Defendant's statement to Detective Pridemore, he stated that he had not been in the victim's house in ten years. We conclude that there is sufficient evidence for the jury to find that the Defendant was the perpetrator beyond a reasonable doubt.

This issue is without merit.

### B.

The Defendant's second issue under insufficiency of the evidence is that the evidence was insufficient to prove premeditation and deliberation as required for first degree murder. The trial judge instructed the jury under Tennessee Code Annotated section 39–13–202(a)(1), which states, "(a) First degree murder is: (1) An intentional, premeditated and deliberate killing of another...." Tenn. Code Ann. § 39–13–202(a)(1) (1991). The elements of premeditation and deliberation are questioned in this appeal.

" 'Premeditated act' means one done after the exercise of reflection and judgment. Premeditation may include instances of homicide committed by poison or by lying in wait." Tenn.Code Ann. § 39–13–201(b)(2) (1991). " 'Deliberate act' means one performed with a cool purpose." Tenn.Code Ann. § 39–13–201(b)(1) (1991). The Tennessee Supreme Court recently addressed the issues of premeditation and deliberation in *State v. Brown*, 836 S.W.2d 530 (Tenn.1992), and further addressed premeditation in *State v. West*, 844 S.W.2d 144 (Tenn.1992). In *Brown*, the court emphasized that deliberation and premeditation are two separate elements of first degree murder. The court addressed the history of the law in this area and quoted the present statute which was not in effect at the time of the crime addressed

in the *Brown* case. 836 S.W.2d at 538–43. Deliberation, the court said, "requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.'" *Id.* at 540. Premeditation does not require a specific amount of time to pass between the formation of the idea and the act. *Id.* However, the intent necessary to commit first degree murder may not be formed in an instant because of the additional requirement of deliberation. *Id.* at 543. Furthermore, repeated blows alone are not enough to prove first degree murder. *Id.*

The State argues several circumstances to prove premeditation and deliberation. The evidence of multiple blows is argued first, although it is emphasized in the State's argument that this circumstance is to be considered in conjunction with the other circumstances argued. The phone being ripped off the wall is one of the circumstances surrounding the murder that the State argues is indicative of premeditation and deliberation. The State argues that the Defendant's argument that the phone was ripped off the wall after the murder, as opposed to before the murder, is implausible. The State argues that there would be no reason to rip the phone off the wall after the murder because the only person who would have used the phone was dead. The State insists that the phone being ripped off the wall before the murder leads one to infer premeditation and deliberation. The State also argues that the fact that the condition of the house and the nature of the wounds do not suggest a struggle proves premeditation and deliberation. There were no signs of a struggle in the house and the body did not have any defensive wounds. The State argues that these circumstances, together, prove deliberation and premeditation.

These arguments are similar to the arguments made by the State in *West* concerning the defendant's retrieval of his gun to shoot the victim. *West,* 844 S.W.2d at 148. In *West,* as in this case, there were no witnesses to either the murder or the time period immediately before and after it. The Tennessee Supreme Court in *West* stated that although the State's theory might have been true, it was still just a theory. *Id.* at 148. The same must be said for this case. Although the State's arguments are strong and could very well be correct, the argument is still a theory.

We conclude that there is insufficient evidence in this record to support the jury's findings of the necessary elements of premeditation or deliberation. Therefore, the Defendant's conviction of first degree murder cannot stand. "[I]n the absence of proof of deliberation and premeditation, an unlawful killing is presumed to be second degree murder." *Id.* Second degree murder is defined as, "a knowing killing of another." Tenn.Code Ann. § 39–13–210 (1991). Knowing is defined as, "[a] person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn.Code Ann. § 39–11–106(20) (1991).

We find that there is evidence to support "knowing" conduct and therefore a second degree murder conviction. We modify the conviction to second degree murder. This case is remanded to the trial court for sentencing for the offense of second degree murder.

WADE and WHITE, JJ., concur.