# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE v. WAYNE L. HOLT

### Direct Appeal from the Criminal Court for Davidson County
### No. 99-B-803     J. Randall Wyatt, Jr., Judge

---

### No. M2001-00945-CCA-MR3-CD - Filed November 5, 2002

---

Appellant, Wayne L. Holt, was indicted by the Davidson County Grand Jury on one count of first degree felony murder, one count of premeditated first degree murder, and one count of especially aggravated robbery. At the close of the State's case-in-chief, the trial court granted Appellant's motion for judgment of acquittal as to the count of first degree felony murder and to the count of especially aggravated robbery, but not as to the remaining count of premeditated first degree murder. Appellant was convicted by a jury of his peers of the lesser-included offense of second degree murder and was sentenced, as a Range II multiple offender, to thirty (30) years imprisonment. In this appeal of right, Appellant raises five (5) issues for our review. He contends that the trial court committed reversible error in: 1) denying Appellant's pretrial motion to suppress his statement; 2) denying Appellant's motion for judgment of acquittal as to the count of premeditated first degree murder at the close of the State's case-in-chief; 3) overruling Appellant's objection to the State's closing argument; and 4) granting the State's request for a flight instruction. He further contends that the verdict was against the weight of the evidence. After a thorough review of the record, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Trial Court is Affirmed.

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Bruce Poag, Thompson's Station, Tennessee (on appeal); Ross E. Alderman, District Public Defender; Wendy Tucker, Assistant Public Defender; and Jodie Bell, Assistant Public Defender, Nashville, Tennessee (at trial) for the appellant, Wayne L. Holt.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Dan Hamm, Assistant District Attorney General; and Sharon Brox, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Appellant was convicted for stabbing to death the victim inside the victim's home. At trial, Appellant did not deny having stabbed the victim. Instead, he raised the affirmative defense of self-defense, claiming that the victim attacked him first with a knife and Appellant protected himself with his own knife.

On the afternoon of January 29, 1999, Appellant went to the rooming house in North Nashville where the victim, Calvin Johnson, lived. He came to the house looking for the victim, according to the testimony of Simone Tibbs, who also lived there with her husband Joseph and was present at the house that day. Appellant and the victim talked for a while. Then Appellant walked next door to the construction office, where the victim worked and asked the victim's brother, James, a supervisor, whether the victim was paid that day. The victim's brother replied that he had been paid, and Appellant left without saying anything else. Mrs. Tibbs saw Appellant come out of the construction office and walk back into the rooming house, and then leave several minutes later. James Johnson testified that shortly afterwards, someone ran inside and said that Appellant had stabbed the victim and to call the paramedics.

Robert Turner, a paramedic, testified that he found the victim lying face up on the bed with his knees bent over the side of the bed. The victim had a stab wound to the chest. Turner testified that it is common procedure to do a "soft patdown" of a victim when a paramedic moves an unconscious victim to be transported. In doing so, a small knife was found in the victim's back pocket. The victim was transported to Metro General Hospital, where he was later pronounced dead.

Detective David Imhoff testified that he went to the hospital where the victim had been taken. He found a small paring knife on the table next to the gurney on which the deceased was lying. He talked to the paramedics and learned that the knife had been removed from the victim's back pocket.

LaShonda Stewart knows Appellant and lived a couple of blocks from the victim at the time of the incident. She testified that Appellant came to her house on the afternoon of January 29, 1999. She was standing on her porch. She testified that Appellant said he needed to talk to her and that he had "f---ed somebody up." Stewart testified that Appellant told her that he had stabbed the victim, pointing to his chest. She testified that Appellant seemed to be confused and panicked, and she refused to let him come inside. Stewart watched Appellant leave and saw him get into Joe Batts' car, which was parked on the corner.

Joseph Batts testified that he was driving in the neighborhood that afternoon, and he saw an ambulance sitting outside the apartment where the victim was stabbed. He drove a couple of blocks past and saw Appellant and stopped. Appellant asked him to give him a ride somewhere. They drove to the store, where Appellant bought a beer, and then they drove to some nearby townhouses and sat in the parking lot and "smoked dope." Then, Appellant asked Batts to drive him back to LaShonda Stewart's house. When they got close to her house, they saw that it was surrounded by

police cars, and Appellant told him to drive somewhere else. Appellant asked Batts to drive him to East Nashville, where Batts dropped him off.

Rosaura DeRios testified that Appellant arrived at her house in East Nashville on the evening of January 29, 1999. She testified that he stayed at her house for three days because she was ill and taking medication at the time, and therefore was unable to drive him home that same night.

## Motion to Suppress Statements

Appellant asserts that the trial court erred in denying his motion to suppress two separate statements given to police. Prior to trial, Appellant filed a motion to suppress the statements he gave to investigating detectives, Gray and West. Appellant argues that the first statement, given to Detective Gray, was inadmissable because 1) he had not been properly advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); and 2) the statement was a product of coercion. Appellant argues that the second statement, given to Detective West, was inadmissible because Appellant did not voluntarily and knowingly relinquish his *Miranda* rights before giving it. The State contends that the trial court properly denied the motion. The State argues that Appellant's statement to Detective Gray was not the result of an interrogation, and therefore, *Miranda* warnings were not required. The State further asserts that the second statement, given to Detective West, was properly preceded by *Miranda* warnings and waivers.

At the suppression hearing, Detective Gray testified that he became involved in the investigation when he was asked by homicide detectives to help in locating Appellant because Detective Gray had known Appellant's family for many years. He testified that he contacted Appellant's family and advised them of a warrant for Appellant's arrest. The following day, he received a call from Appellant's family, advising him that Appellant was in a particular location. Detective Gray went to the location, where he found Appellant and told him that he had a warrant for his arrest. Detective Gray testified that Appellant did not appear to be intoxicated or under the influence of any controlled substances. However, on cross-examination, he testified that the house in which he found Appellant looked like a "crack house."

According to Detective Gray's testimony, he waited outside while Appellant stayed inside the house for several minutes. He then went back inside to get Appellant, and they got in his police car to drive to the criminal justice center. Detective Gray testified that Appellant began crying and talking about the incident for which he was being arrested. Detective Gray cautioned him that he did not have to say anything. Appellant responded that he knew he did not have to talk, but he thought his life was over. Appellant explained to Detective Gray that the victim had owed him fifty dollars, and when Appellant approached the victim about the fifty dollars, the victim became belligerent and attacked him. Appellant told Detective Gray that he was protecting himself. He also told him that after the incident, he put the knife with which the victim was killed in the back of a pickup truck. Detective Gray testified that he did not read Appellant his *Miranda* warnings and did not ask him any questions concerning the incident.

Detective West, the lead detective in the investigation, also testified at the suppression hearing. He testified that on the same day Detective Gray located Appellant, he was contacted and told of Appellant's arrest. He further testified that when he arrived at the police station to interview Appellant, he advised Appellant of his rights and Appellant signed a rights waiver form. Detective West testified that he assessed Appellant's physical capabilities and determined that he was not too intoxicated, or otherwise under the influence, to give a statement. Detective West tape-recorded the statement, which he summarized for the trial court at the hearing. As Detective West remembered the statement, Appellant went to the house where the victim lived to collect fifty dollars, which the victim owed Appellant. The victim told Appellant that he did not have the money, so Appellant went next door to the construction company where the victim's brother worked and asked if the victim had been paid that day, to which the victim's brother replied that he had. Appellant went back over to the victim's house to confront him again, and the victim pulled out a knife. Appellant pulled his knife and swung a couple of times and left, but Appellant did not know if he had stabbed the victim or not.

Appellant testified at the suppression hearing that he "got high" from around 1:30 a.m. until 10:30 a.m. the morning that Detective Gray arrested him. He testified that he smoked about a gram of cocaine and drank a half pint of vodka and a quart of beer. He also testified that Detective Gray waited while he went inside to do more drugs. After he got into the car, Appellant testified that Detective Gray asked, "what happened, man?" With regard to the taped interview at the police station, Appellant did not remember Detective West going over his rights with him before interviewing him. He admitted at the hearing, however, that the signature on the rights waiver form was his, but he did not remember signing it.

At the conclusion of the hearing, the trial court overruled the Appellant's motion to suppress the statements. The record shows that, with regard to Appellant's first statement to Detective Gray, the issue of whether to suppress the statement turned on witness credibility. Appellant testified at the suppression hearing that Detective Gray asked him questions concerning the killing, and Detective Gray testified that he did not. The trial court gave more weight to the credibility of Detective Gray's testimony, and ruled that "there was not an interrogation as required by *Miranda*." With regard to Appellant's statement to Detective West, the trial court found that Detective West advised Appellant of his *Miranda* rights, that Appellant executed a waiver form, and Appellant gave a voluntary statement. The trial court found that Appellant understood the effect of waiving his rights and was not in such a condition from drugs and alcohol to render his waiver ineffective.

The issues of whether Appellant was interrogated or coerced by Detective Gray, or whether he gave a voluntary confession to Detective West are questions of fact. *See State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996); *Childs v. State*, 584 S.W.2d 783, 786-87 (Tenn. 1979). On appeal, the "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *Id.* The trial court's application of the law to the

facts, however, is subject to a *de novo* standard of review. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

Because the trial court is in a superior position to that of the appellate courts to judge witness credibility, it should be afforded wide latitude of discretion in determining whether *Miranda* warnings were required, "and unless it clearly appears that such discretion has been abused and the defendant's rights infringed upon, appellate courts will not intervene." *State v. Nakdimen*, 735 S.W.2d 799, 802 (Tenn. Crim. App. 1987). Nevertheless, we may consider the "testimony presented at trial . . . in deciding the propriety of the trial court's ruling on a motion to suppress." *State v. Perry*, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999).

First, we must determine whether Appellant's statement to Detective Gray should have been preceded by *Miranda* warnings. The United States Supreme Court held in *Miranda v. Arizona*, 384 U.S. at 444, that in order to safeguard the constitutional protections afforded in criminal proceedings, "the prosecution may not use statements...stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."

Because *Miranda* is only implicated when the defendant is questioned while in police custody, our initial inquiry is whether Appellant was subjected to a "custodial interrogation." The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Clearly, the Appellant in this case was in police custody at the time he made the statement to Detective Gray. He knew that Detective Gray had a warrant for his arrest, and he was being transported to the police station in Detective Gray's car when he made the statement.

The next issue is whether the Appellant was subjected to an interrogation by Detective Gray. The *Miranda* Court defined interrogation as "questioning initiated by law enforcement officers." 384 U.S. at 444. In *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), however, the Court made clear that interrogation is not limited to express questioning by police, "but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are likely to invoke an incriminating response from a suspect."

The State argues that Appellant's statement to Detective Gray was unsolicited and was given knowingly and voluntarily. Appellant contends that the police used coercive tactics to obtain the confession by having Detective Gray, a close family friend, take Appellant into custody, and it was because Appellant trusted Detective Gray that he made the incriminating statement. After admitting on cross-examination that he had been arrested and read his rights on several prior occasions, Appellant and the prosecutor had the following exchange:

> [PROSECUTOR]: But you know what your rights are. And you knew you didn't have to talk to Detective Gray, didn't you?

[APPELLANT]:      Well, I ain't never really been that high to, you know. Detective Gray is a friend of mine. Would you talk to him if you had a friend who you think was going to help you?

[PROSECUTOR]:    And that's why you talked to him, wasn't it?

[APPELLANT]:      After he asked me, yes, ma'am.

[PROSECUTOR]:    You thought he was going to help you, right?

[APPELLANT]:      (No response).

Appellant relies on our supreme court's opinion in *State v. Branam*, 855 S.W.2d 563 (Tenn. 1993), and argues that he was "psychologically" coerced into confessing to Detective Gray. In *Branam*, the "interrogation" was made by the defendant's aunt, who was acting as an undercover agent for the state. *Id*. at 568. The supreme court, nevertheless, found that the defendant's trust in his family member was "misplaced," and affirmed the trial court's admission of the statement. *Id*. Here, while Detective Gray may have been a close friend of Appellant, Appellant knew that he was a suspect in a murder investigation and that Detective Gray was the arresting police officer. In *Branam*, the supreme court recognized that "under some circumstances, deceptive interrogation practices by law enforcement officers may be so unfair that they offend notions of due process." *Id*. at 269. We conclude that this is not such a case, and Appellant's statement to Detective Gray was properly admitted. The evidence does not preponderate against the trial court's findings that Detective Gray did not question Appellant on the way to the police station, but rather Appellant volunteered his statement.

Next, we consider whether Appellant effectively waived his rights prior to giving his statement to Detective West at the police station. Again, we apply the standard articulated by the supreme court in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Appellant must demonstrate that the evidence preponderates against the trial court's findings. *Id*. at 23. Intoxication is not alone sufficient to bar the introduction of statements made by an accused if evidence also shows that the accused was capable of understanding his rights. *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). The evidence at the suppression hearing reveals that Appellant signed a rights waiver form. Appellant's criminal history and apparent understanding of the seriousness of the charges against him make clear that he was capable of understanding his rights as an accused. Appellant testified at the suppression hearing that he knew that the police were investigating a homicide and indicated that he understood the seriousness of the charges against him. Furthermore, his testimony reveals that he had no trouble remembering events up to and after the time when Detective West advised him of his rights.

We conclude that Appellant's constitutional rights were not violated. The evidence in the record supports the trial court's findings that Appellant was advised of his *Miranda* rights, that he

waived those rights, and that he gave a voluntary statement. Thus, the statements were properly admitted. Appellant is not entitled to relief on this issue.

## Motion for Judgment of Acquittal

Appellant contends that the trial court erred in denying his Motion for Judgment of Acquittal as to the count of first degree premeditated murder at the close of the State's proof. A trial court must grant a motion for judgment of acquittal if the evidence is legally insufficient to sustain a conviction of the charged offense. Tenn. R. Crim. P. 29. In making its determination, the trial court may not address the weight of the evidence, but must afford the State the strongest legitimate view of the evidence, including all reasonable inferences to be drawn from the evidence, and disregard any evidence introduced by the accused that conflicts with the evidence introduced by the State. *State v. Blanton*, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996); *State v. Campbell*, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995).

We apply the same standard in reviewing a denial of a motion for judgment of acquittal as the trial court applies in granting or denying such a motion. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). We must determine whether any reasonable trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). In so doing, we review the evidence in a light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

In challenging the trial court's denial of his motion, Appellant argues that the State failed to establish beyond a reasonable doubt the element of premeditation. We need not decide this issue, however, because the jury convicted Appellant of second degree murder, defined as "[a] knowing killing of another," Tenn. Code Ann. § 39-13-210(a)(1), and the record is replete with evidence that is sufficient to support the conviction. Appellant is not entitled to relief on this issue.

## Verdict Against the Weight of the Evidence

Appellant argues that the weight of the evidence preponderates against the verdict of the jury. Pursuant to Rule 33(f) of the Tennessee Rules of Criminal Procedure, the trial court has the authority to reverse a jury's verdict when it determines that the verdict is contrary to the weight of the evidence. This court, however, may not reweigh or reevaluate the evidence on appeal. *See State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The accuracy of the trial court's determination as a "thirteenth juror" is not subject to appellate review. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)). Once the trial court approves the verdict of the jury and denies a defendant's request for a new trial, our review is limited. *Burlison*, 868 S.W.2d at 719. An appellate court may grant a new trial only where the trial court has "*failed* to act as the thirteenth juror," as it is the "only practically effective remedy." *Moats*, 906 S.W.2d at 435 (emphasis added). We conclude, however, that the trial court properly exercised its authority to act as thirteenth juror, and therefore, we will not disturb its determination that the weight of the evidence supported the jury verdict.

While a defendant may not challenge on appeal the weight of the convicting evidence, he or she may challenge the sufficiency of the convicting evidence. To the extent that Appellant's argument may be construed as a challenge to the sufficiency of the evidence, we conclude that the evidence was sufficient. Viewing the evidence in a light most favorable to the State, Appellant confronted the victim inside the victim's house, armed with a knife, and stabbed the victim in his chest and neck. He then left the scene of the crime and disposed of the weapon. He also avoided an opportunity to confront police and stayed away from the area of the crime for three days. The jury rejected Appellant's defense of self-defense. Any rational trier of fact could conclude beyond a reasonable doubt that Appellant unlawfully and knowingly killed the victim. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Appellant is not entitled to relief on this issue.

**Appellant's Objection to State's Closing Argument**

Appellant contends that the trial court committed prejudicial error in overruling Appellant's objection to the State's closing argument. During closing arguments, the State rhetorically asked the jury, whether "it was self-defense when you walk into somebody else's house [and] demand money from him." Appellant made a timely objection, and the trial court overruled the objection. Appellant argues that the State's remark suggesting a robbery was improper because there was no proof in the record that Appellant demanded money from the victim.

Closing argument is a valuable tool for the parties during the trial process. *State v. Humphreys*, 70 S.W.3d 752, 767 (Tenn. Crim. App. 2001). Attorneys are generally given wide latitude in the scope of their arguments. *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994). Consequently, a trial court is accorded wide discretion in its control of the closing arguments. *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). We will not interfere with that discretion in the absence of abuse. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). To show error, a defendant must show that the argument was so inflammatory or the conduct so improper that it affected the verdict to the defendant's detriment. *Zirkle*, 910 S.W.2d at 888.

We conclude that the State's comment during closing argument, suggesting that Appellant demanded money from the victim, was not improper, and the trial court did not err in overruling Appellant's objection. Evidence was introduced at trial from which the jury could have inferred that the victim owed Appellant money for drugs. The victim's brother testified that he was aware of the victim's drug habit and that the victim owed people money for drugs, stating that he knew the victim owed "one person, in particular." Furthermore, the trial court instructed the jury that any statements made that are not supported by the evidence should be disregarded. Appellant is not entitled to relief on this issue.

**Flight Instruction**

Appellant contends that the trial court committed prejudicial error in granting the State's request for a flight instruction. He argues that his actions did not indicate an attempt to flee or avoid

apprehension and prosecution, and the instruction improperly created an inference of guilt for the jury.

The record shows that upon leaving the victim's house, Appellant went to LaShonda Stewart's house, who testified at trial that when he arrived at her house, he appeared to be confused and panicked, and she refused to let him in her house. She testified that he drove away with Joe Batts, who was parked on the corner. Stewart testified that a minute later, the police arrived, looking for Appellant.

Joe Batts testified that after he drove Appellant to the store to get a beer and they sat in a parking lot, "smoking dope," Appellant asked him to drive him back to LaShonda Stewart's house. Batts testified that when they got to the corner, they saw eight or nine police cars surrounding Stewart's house. Batts asked Appellant if he wanted to go see what was going on, but Appellant said no and told Batts to drive him to East Nashville, where Batts dropped him off.

On that same night, after the killing, Appellant arrived at Rosauro DeRios' house, where he stayed for three days. Appellant contends that he only stayed at Ms. DeRios' house for so long because she was too ill and drowsy from medication to drive him back to his home in North Nashville. Ms. DeRios testified that during those three days, Appellant watched movies with her children and ate popcorn and candy.

At the conclusion of proof, the trial court instructed the jury as follows:

The flight of a person accused of a crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of guilt....Whether the evidence presented proves beyond a reasonable doubt that the defendant fled *is a question for your determination*....it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community...to constitute flight....[Y]ou may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the defendant.

(Emphasis added).

Appellant contends that he did not hide out or evade police by staying at Ms. DeRios' house for three days. He also asserts that when he returned to North Nashville, he learned that an arrest warrant had been issued for him and asked someone to call Detective Gray on his behalf and make arrangements for his arrest. Appellant argues that the proof does not satisfy the second element necessary for flight, "a subsequent hiding out, evasion, or concealment in the community." *See State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989).

In *State v. Richardson*, 995 S.W.2d 119, 128-129 (Tenn. Crim. App. 1998), this Court held that a flight instruction was warranted where the defendant left the scene of a shooting and remained hidden in the community for five days. The defendant in that case argued that it was against public

policy to penalize him because he eventually turned himself in to the police, but our Court rejected that argument and affirmed the trial court's instruction on flight.

In *State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994), the supreme court addressed the propriety of a flight instruction where the defendant abandoned a stolen car filled with stolen goods and remained free for one year. The court found circumstantial evidence of an immediate flight because the facts led to a reasonable inference that the defendant had seen the flashing lights of a passing police car, which was responding to another call nearby, and concealed himself and left the scene. *Id.* Here, the record shows that Appellant saw police at LaShonda Stewart's house, and he then went to Ms. DeRios' house, where he stayed for three days. That evidence is sufficient to justify a flight instruction in this case.

In *Smith*, our supreme court held that even if the trial court erred by giving an instruction on flight, the error was not reversible because the jury was instructed that the question of "whether the Defendant fled was a question solely for their decision . . . and that flight alone was insufficient to prove guilt." *Id.* The court held that the instructions, which left in the jury's discretion any finding of flight or inference of guilt, "coupled with the overwhelming proof of Defendant's guilt, renders any error as to the flight instruction harmless." *Id.* We hold that the same would be true in this case, and therefore, Appellant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE