## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

## MARCH 1999 SESSION

FILED

August 10, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | No. 03C01-9804-CR-00127 |
| Appellee | * | KNOX COUNTY |
| V. | * | Hon. Richard Baumgartner, Judge |
| JERMAIN HURST | * | (Possession of Cocaine with Intent to Sell, Possession of Marijuana) |
| Appellant. | * | |

For Appellant

J. Liddell Kirk
706 Walnut Street, Suite 902
Knoxville, TN 37902

For Appellee

John Knox Walkup
Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN  37243-0493

Ellen H. Pollack
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN  37243-0493

Paula Gentry
Assistant District Attorney General
Office of the District Attorney
General
City-County Building
Knoxville, TN 37902

Leon Franks
Assistant District Attorney General
Office of the District Attorney
General
City-County Building
Knoxville, TN 37902

OPINION FILED:

AFFIRMED

NORMA MCGEE OGLE, JUDGE

## OPINION

The appellant, Jermain Hurst, appeals his conviction in the Knox County Criminal Court of possession of more than .5 grams of cocaine with the intent to sell, a class B felony, and possession of marijuana, a class A misdemeanor. The trial court imposed, respectively, concurrent sentences of ten years incarceration in the Tennessee Department of Correction and eleven months and twenty-nine days incarceration in the Knox County Jail. On appeal, the appellant presents only one issue for our consideration: Whether the trial court erroneously denied his motion to suppress the State's use at trial of money, cocaine, and marijuana seized by the police. Following a thorough review of the record and the parties' briefs, we affirm the judgment of the trial court.

## Factual Background

Preliminarily, our supreme court has held that appellate courts may consider proof adduced both at the suppression hearing and at trial in evaluating the correctness of a trial court's ruling on a pre-trial motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Accordingly, in summarizing the relevant facts, we draw upon the transcripts of both proceedings.

The record reflects that, on the evening of April 7, 1996, Officer Gary Moyers of the Knoxville Police Department was employed by the Knoxville Community Development Corporation ("K.C.D.C."), a private landlord, to patrol a housing development named Western Heights. He was accompanied by Scott Sheppard, another officer of the Knoxville Police Department. The officers were responsible for maintaining peace and order within the development and ensuring that individuals on the property were either residents of the development or visiting residents. While working for K.C.D.C., both officers wore their Knoxville Police

2

Department uniforms and drove a Knoxville Police Department patrol car. Officer Moyers explained that he was acting as an officer of the Knoxville Police Department in addition to providing security for K.C.D.C.

On the evening in question, the officers were patrolling the area in the development surrounding the "Boys Club/Girls Club." Prior to this evening, they had received complaints concerning drug activity in that area. Additionally, they had received complaints concerning trespassers loitering on residents' porches. At approximately 8:00 p.m., they observed six men, including the appellant, gathered on the porch of one of the apartments. Officer Moyers testified that the appellant captured his attention, because, when the appellant saw the patrol car,

> he move[d] quickly to the inner rim up on the porch and [sat] down in a chair, and he duck[ed] down and look[ed] between the railing - - the porches have two rails - - two metal rails - - as a border on the porch, and he [looked] between the two rails at me as I [looked] up at the group and just [watched] us real intensely as we [drove] by. Everyone else just didn't pay any attention to us. They just stood there and talked and carried on in a normal manner.[1]

When the officers again drove past the apartment, the appellant was still seated in the chair and was still observing the officers "real intense." Officer Moyers recalled, "When he sees us, he ducks down and looks between the rails, and he is looking between the people as we drive by . . . ."

At this point, the officers decided to question the appellant in order to ensure that he was either a resident of the development or a visitor. Accordingly, they drove back toward the apartment building and parked the patrol car on a street close to the rear of the building. As they walked toward the rear of the apartment

---

[1]Contrary to the appellant's argument in his brief, apparently not all residents of the Western Heights development "instinctively feel threatened" by the police.

building, they observed the appellant. He had left the porch and was looking in the direction in which the officers had last departed in their patrol car. When the appellant noticed the officers approaching on foot, he immediately fled. Officer Moyers and Officer Sheppard pursued the appellant, yelling, "Stop! Police!" Officer Moyers testified that he did not intend to arrest the appellant at that time, but was "attempting to catch him to inquire what his actions were and the reason for being on K.C.D.C. property."

When the appellant fled, Officer Moyers called for assistance. Officer Jim Quick of the Knoxville Police Department responded to Officer Moyers' call and, when the appellant ran in front of his patrol car, joined the chase on foot. Officer Quick then led the other officers in pursuit of the appellant, following the appellant through an apartment and up a nearby hill. Like Officers Moyers and Sheppard, he was dressed in a Knoxville Police Department uniform and was yelling at the appellant to stop.

As they ascended the hill, Officer Quick began to overtake the appellant. As he drew closer to the appellant, Officer Quick observed him stop, remove a plastic bag from his pocket, and throw the bag onto the roof of a nearby porch.[2] Officer Quick testified that the appellant "just tossed [the bag] up there, and then turned around. . . . [A]s soon as he threw the baggy, he pretty much just gave up."

Immediately thereafter, Officer Quick reached the appellant, ordered him to lie prone on the ground, and placed him in handcuffs. He was soon joined by

---

[2]Officer Moyers, who was a greater distance from the appellant, testified that the appellant slowed his pace prior to discarding the plastic bag.

Officers Moyers and Sheppard, who immediately retrieved the plastic bag from the porch roof. The officers discovered that it contained thirty "quail size" or "quarter-gram-size" bags of a white powdery substance and one hundred and twenty-three dollars ($123), primarily in twenty dollar ($20) bill denominations. Officer Moyers testified that, in his experience, cocaine was packaged in this manner for retail and was sold for twenty dollars ($20) per "quail size" bag. The police later determined that the bag, in fact, contained a total amount of 4.3 grams of cocaine.

After retrieving the bag, the officers ascertained the appellant's name and ran a records check which revealed an outstanding warrant for the appellant's arrest. Officer Moyers testified that they arrested the appellant "due to the fact that there was outstanding warrants on him." The officers then searched the appellant, discovering another bag in the appellant's pocket containing what appeared to be marijuana. The police later confirmed that the bag contained 4.6 grams of marijuana.

Following a suppression hearing and in response to the appellant's motion for new trial, the trial court found that Officers Moyers and Sheppard had possessed a reasonable, articulable suspicion of criminal activity when they first approached the appellant. The trial court concluded without further explanation that the officers' ensuing conduct was "appropriate law enforcement conduct."

**Analysis**

The appellant argues that the trial court should have suppressed the money, cocaine and marijuana, because the police obtained the money and drugs as a result of the officers' illegal seizure of the appellant. In response, the State relies upon the decision of the United States Supreme Court in California v. Hodari

5

D., 499 U.S. 621, 111 S.Ct. 1547 (1991). The State's position is well taken.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure . . . against unreasonable searches and seizures , shall not be violated . . . ."[3] However, the fact that an accused has been unlawfully seized only becomes relevant when the State seeks to introduce evidence tainted by the seizure. Caldwell v. State, 917 S.W.2d 662, 666 (Tenn. 1996)(citation omitted in original). In those circumstances, the exclusionary rule bars the admissibility of the tainted evidence. Segura v. United States, 468 U.S. 796, 804-805, 104 S.Ct. 3380, 3385 (1984). See also State v. Patton, 898 S.W.2d 732, 734 (Tenn. Crim. App. 1994); State v. Taylor, No. 02C01-9501-CR-00029, 1996 WL 580997, at *13 (Tenn. Crim. App. at Jackson, October 10, 1996).

Thus, the legality of the appellant's seizure in this case, i.e., whether the police possessed a reasonable, articulable suspicion of criminal activity or probable cause to believe that a crime had occurred, is *only* relevant if the disputed evidence flowed from the seizure. In order to determine the nexus between the disputed evidence and the appellant's seizure, we must first determine at what point the encounter between the appellant and the police officers ripened into a seizure within the meaning of the Fourth Amendment.

Initially, police questioning by itself is unlikely to implicate Fourth Amendment concerns. State v. Darnell, 905 S.W.2d 953, 957 (Tenn. Crim. App.

---

[3]Article I, Section 7 of the Tennessee Constitution similarly provides "[t]hat the people shall be secure . . . from unreasonable searches and seizures . . . ." The Tennessee Supreme Court has previously noted that generally "'article I, section 7 is identical in intent and purpose with the Fourth Amendment.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997)(citation omitted). However, the court also noted that, in some cases, the Tennessee Constitution may afford greater protection. Id. Nevertheless, in the context of this case, we view the protections provided by both documents as coextensive.

1995).  See also State v. Crutcher, 989 S.W.2d 295, 300 (Tenn. 1999).   In other words, a police officer does not effectuate a Fourth Amendment seizure by approaching a citizen and casually asking questions.  However, the line between a casual, investigatory stop and a Fourth Amendment seizure is crossed whenever "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ."  Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879 n.16 (1968).  See also Downey, 945 S.W.2d at 106.

It is undisputed in this case that, upon the appellant's flight, Officers Moyers and Sheppard attempted to effectuate a seizure by a "show of authority." Whether the officers thereby restrained the appellant's liberty and executed a Fourth Amendment seizure is determined, in part, by asking whether, "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979 (1988)(citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980)(opinion of Stewart, J.)).  See also State v. Wilhoit, 962 S.W.2d 482, 486 (Tenn. Crim. App. 1997).  Clearly, a reasonable person would not have believed he was free to ignore the officers' order to stop running.

That having been said, the Supreme Court in Hodari D., 499 U.S. at 628, 111 S.Ct. at 1551, clarified that the "Mendenhall test" enunciated above is "a necessary, but not a sufficient, condition for a seizure."  Accordingly, the Court held that, when a police officer attempts to effectuate by a show of authority either a "Terry stop" or an arrest, a seizure does not occur if the subject does not yield.  Id. at 626-627, 1550-1551.  The Court explained that the word seizure contained in the Fourth Amendment "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee."  Id. at

7

626, 1550. This court adopted the logic of <u>Hodari D.</u> in <u>State v. Holbrooks</u>, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998).

Accordingly, the police did not seize the appellant within the meaning of the Fourth Amendment until he submitted to the officers' show of authority. Moreover, pursuant to <u>Hodari D.</u>, any evidence abandoned by the appellant before his surrender was not subject to the exclusionary rule, even if the *attempted* seizure was unsupported by a reasonable suspicion of criminal activity or probable cause to believe that a crime had occurred. 499 U.S. at 629, 111 S.Ct. at 1552. Thus, we must determine when the appellant submitted to the officers' show of authority.

The appellant argues in his brief that he submitted to the police when he stopped running. Moreover, he contends that he stopped running before discarding the plastic bag containing money and cocaine. We note that, following the suppression hearing, the trial court found that the appellant stopped running *after* discarding the disputed evidence. However, the testimony at the suppression hearing and at trial was somewhat contradictory with respect to this factual issue. <u>See supra</u> p. 4 and note 2. Nevertheless, this court must uphold a trial court's findings of fact following a suppression hearing unless the evidence preponderates otherwise. <u>Crutcher</u>, 989 S.W.2d at 299. In any case, we do not agree with the appellant that his act of stopping was necessarily simultaneous with his submission to the officers' show of authority. Inasmuch as discarding the plastic bag was itself an act of defiance, it would be illogical to conclude that the appellant submitted to the officers prior to that time. Therefore, we conclude that the appellant was seized within the meaning of the Fourth Amendment after throwing the money and the cocaine onto the porch roof. Because the money and cocaine were not subject to the exclusionary rule, they were admissible at the appellant's trial for possession of

8

cocaine with intent to sell.

We also conclude that the marijuana was not subject to the exclusionary rule. Unquestionably, when the appellant complied with Officer Quick's order to lie prone on the ground and when the officer handcuffed the appellant, he was seized within the meaning of the Fourth Amendment. However, regardless of the legality of this initial seizure, the plastic bag containing cocaine and money provided independent probable cause to support the appellant's subsequent, legal arrest and search incident to an arrest. Taylor, No. 02C01-9501-CR-00029, 1996 WL 580997, at *13 ("even if the initial contact was an unlawful seizure, evidence discovered through a subsequent legal arrest based on independent probable cause is admissible"). See also New York v. Harris, 495 U.S. 14, 17, 110 S.Ct. 1640, 1642 (1990)(the Court observed that it "'had declined to adopt a "per se or 'but for' rule" that would make inadmissible any evidence . . . which somehow came to light through a chain of causation that began with an illegal arrest'"). The trial court properly denied the appellant's motion to suppress the marijuana.

## Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
Norma McGee Ogle, Judge

_____
Gary R. Wade, Judge

_____

9

Cornelia A. Clark, Special Judge