IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 20, 2004

## STATE OF TENNESSEE v. FRED ALLEN OWENS

**Direct Appeal from the Criminal Court for Knox County**
**No. 73949     Richard Baumgartner, Judge**

_____

**No. E2003-02003-CCA-R3-CD**
**May 25, 2004**
_____

The Defendant, Fred Allen Owens, was convicted by a jury of second degree murder. The trial court sentenced the Defendant as a Range II multiple offender to thirty-five years in the Department of Correction. In this direct appeal, the Defendant challenges several of the trial court's evidentiary rulings and also challenges the sufficiency of the evidence supporting his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Brandt Davis, Knoxville, Tennessee, for the appellant, Fred Allen Owens.

Paul G. Summers, Attorney General and Reporter; Michelle R. Chapman, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leland Price, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Melissa Bell testified that she is the younger sister of the Defendant's girlfriend, Melinda Reilly. Ms. Bell stated that she had known the Defendant for about one year, through her sister. The Defendant and Ms. Reilly often drank heavily together.

On Sunday, August 26, 2001, Ms. Bell got a telephone call from her sister. Her caller identification system identified the call as coming from Ola Rudder's phone. Ms. Rudder is the Defendant's aunt and next-door neighbor. While speaking with Ms. Reilly, Ms. Bell overheard the Defendant in the background, telling Ms. Reilly "to be quiet, to hang up the phone, that [Ms. Bell] would tell the police, [she] would turn them in." As a result of this phone call, Ms. Bell became concerned about Gene Fleenor, a man she knew and had last seen about two months earlier. Ms. Bell telephoned Mr. Fleenor's home twice but got no answer either time. Ms. Bell than called her

sister back and told Ms. Reilly that she had gotten no answer. When Ms. Bell told Ms. Reilly that she was going over to Mr. Fleenor's house, Ms. Reilly began crying and stated, "Please, don't go over there. Don't do that." During this phone conversation, Ms. Bell again heard the Defendant in the background, telling Ms. Reilly to "Hang up the f--king phone. She's going to call the police. She's going to turn us in."

Ms. Bell decided to go to Mr. Fleenor's house. She stopped on her way and picked up a girlfriend to accompany her. At Mr. Fleenor's house, she first tried the front door and found it locked. Because she could not see into the front window, she went to the back of the residence. Looking through one of the back windows, she saw Mr. Fleenor "laying in the living room floor." Ms. Bell "freaked out" and drove to the nearest store where she called 911. A short time later, a fire truck and several police officers arrived at Mr. Fleenor's residence. Mr. Fleenor was determined to be deceased.

The next day, Ms. Bell received another phone call from her sister. Ms. Bell's caller identification system indicated that this phone call was made from a cell phone. While speaking with her sister, Ms. Bell heard the Defendant in the background saying, "Hang up the phone. The phone's tapped. Hang up the phone." The phone then went dead, and Ms. Bell did not hear from her sister again.

Ms. Bell described the victim as "a little-bitty tiny man" who was "very thin" and used a cane. She explained that the victim drank a lot and was in poor health. Ms. Bell also stated that her sister, Ms. Reilly, "chews on her [finger]nails constantly . . . all the way down to her skin, to her nubs." Ms. Bell testified that Ms. Reilly had done so "all of her life."

On cross-examination, Ms. Bell admitted that she did not inform the police about what she testified to having overheard the Defendant say during her phone conversations with her sister. She further admitted that she had never spoken with the Defendant over the phone. She acknowledged that she had never seen the Defendant argue with the victim, and that he and Ms. Reilly sometimes slept at the victim's house. She admitted Ms. Reilly was "very drunk" during their initial phone call and that Ms. Reilly had, in the past, told wild, untrue stories. She stated that Ms. Reilly was supposed to take lithium. She also admitted that she "hates" the Defendant and would like to see him "put away forever."

Lieutenant Terry Lee supervised the crime scene unit at the victim's residence. He arrived at the scene at about 2:45 in the afternoon of August 26, 2001. On the sidewalk from the driveway to the house, he saw a reddish stain, of which he took photographs and swab samples. He testified that he observed markings that were consistent with someone who was bloody being drug. He did not see any blood on the living room carpet where the victim was found. There was also no appearance of a struggle in the living room. Lt. Lee stated that the victim appeared as though he had been drug into the residence because his shirt was pulled up and his pants were down around his hips.

Officer Brad Park searched the Defendant's residence. There he found the victim's wallet. He also found some tissues that appeared to be bloodstained. He collected a sheet from the Defendant's couch because it appeared to have a bloodstain on it. He also found a pair of jeans that appeared to be bloodstained and a telephone in the living room that appeared to have blood on it. None of the items that appeared to contain blood looked as though they had been hidden. Officer Park also explained that he had found several skillets in the Defendant's residence, some of which were dirty, and the largest of which weighed a "couple of pounds." This large skillet did not have a handle.

Officer Carolyn Hancock also worked on the crime scene unit. She found a piece of paper along the roadway near the Defendant's home that had a red stain on it as well as hair.

Detective Tom Cox interviewed Ms. Bell and obtained from her the cell phone number that appeared on her caller identification system on August 27, 2001. Det. Cox traced this number to a Mr. Howard Drew in the Johnson City area. Det. Cox obtained the Defendant's location after speaking with Mr. Drew. Det. Cox went to Johnson City and there took custody of the Defendant and Ms. Reilly. Det. Cox drove the Defendant's car back to Knoxville. On the way, his trousers got "soaked" with what appeared to be blood mixed with a clear liquid. Officer Thomas Finch processed the Defendant's car. He observed and swabbed red stains on the passenger door, the passenger door handle, and the driver's seat. He also collected two pairs of shoes from the Defendant and Ms. Reilly that appeared to have blood on them. He found a latent fingerprint belonging to the victim on the phone found in the Defendant's living room.

Det. Cox interviewed the Defendant at the police station, which interview was recorded on videotape. The videotape was played for the jury and revealed the Defendant explaining that he and Ms. Reilly had picked the victim up at his home at about two or three in the afternoon on Saturday, August 25th, at the victim's request. The victim asked the Defendant to take him to a liquor store, which the Defendant did. The victim bought a half-gallon of liquor. The Defendant then took the victim to the Defendant's home where the Defendant, the victim and Ms. Reilly proceeded to drink and visit. The Defendant and Ms. Reilly were drinking beer, while the victim consumed his bottle of liquor.

The victim became intoxicated and began arguing with Ms. Reilly, using a "nasty mouth." The Defendant explained that, prior to his meeting Ms. Reilly, she used to stay at the victim's home. The victim began talking about how he had "molested" Ms. Reilly while she stayed there. The victim then called Ms. Reilly a "bitch" and a "whore." Ms. Reilly became angry with the victim and "smacked" him in the face with her hand. At some point, the victim got up and began to walk off, but tripped over the coffee table and fell down. The Defendant suggested he just stay there and sleep. However, the victim continued to harass Ms. Reilly. According to the Defendant, Ms. Reilly then picked up a skillet from a box and struck the victim in the back of the head with it. Initially, the Defendant stated that Ms. Reilly struck the victim with the skillet twice. Later, however, he insisted that she struck him only once with the skillet. The only thing the Defendant heard when Ms.

Reilly struck the victim with the skillet was the victim say, "Oh!" Ms. Reilly then placed a pillow under the victim's head, to which the victim said, "thank you," and then began snoring.

According to the Defendant, Ms. Reilly also struck the victim in the face with her fist. The Defendant admitted to having struck the victim across the back of the head twice with his open hand, in response to the victim insulting the Defendant's mother. The Defendant explained the presence of the victim's wallet and glasses in the Defendant's living room by stating that the victim put them there.

The Defendant explained that he and Ms. Reilly took the victim back to his home that evening and carried him in because he was drunk. The Defendant maintained that he did not know the victim was dead, and did not realize that fact until he was arrested and charged with murder. He stated that he did not know what Ms. Reilly may have told Ms. Bell and explained that he and Ms. Reilly went to Johnson City to visit someone in the hospital there.

Agent Meredith Rogers with the TBI forensic unit performed DNA analysis on evidence collected during the investigation. She testified that she found the victim's blood on the following items: Ms. Reilly's shoes; the Defendant's shoes; the passenger door and door handle of the Defendant's car; the driver's seat of the Defendant's car; the sheet collected from the Defendant's residence; the phone found in the Defendant's residence; the jeans found in the Defendant's residence; the bloody tissues found in the Defendant's residence;[1] the swabs collected from the sidewalk at the victim's residence; the paper found in the roadway near the Defendant's residence; and clothes taken from the victim's hamper.

Dr. Sandra Elkins performed the autopsy on the victim. She testified that the victim's injuries included fresh bruises to his upper left arm; bruises and scrapes on his shin bones; scrapes and tears on the skin of his upper and lower back; and a tear and abrasion and bruise on the back of the right hand. The victim also suffered multiple injuries to his neck and head: fresh contusions by the corner of the left eye and on the left cheek; abrasions, bruises and two small lacerations behind and all about the left ear region; and a small laceration on the left side of the neck. Dr. Elkins testified that the victim exhibited external markings of strangulation and that the laceration in his neck could have been caused by a fingernail. There were no injuries to the back side of the victim's head.

Dr. Elkins explained that the victim was suffering from several medical problems at the time of his death. She stated that the victim had severe heart disease; emphysema; cirrhosis of the liver; chronic pancreatitis; changes in the kidney suggestive of high blood pressure; an enlarged prostate; and cerebral atrophy, or shrinkage of the brain. Dr. Elkins explained that some of these conditions

---

[1]Agent Rogers testified that, with respect to the bloody tissue, she found human blood to be present in which she found a partial DNA profile in which the major contributor matched the victim. With respect to this particular item, Agent Rogers stated that there was a chance of one in 9.6 million that the blood could have been from someone else. With respect to the remaining items on which she found the victim's blood, the chance of it being from someone else was less than one in the population of the world.

-4-

were consistent with chronic alcohol abuse. Indeed, at the time of his death, the victim's blood alcohol content was determined to be .23 percent. Dr. Elkins explained that the victim's brain atrophy made him more prone to a subdural hematoma, or blood clot within the skull, from head trauma. The victim died from one or both of two causes: a large subdural hematoma caused by blunt force head injuries to the left side of the victim's head, and strangulation. The victim was alive during the infliction of both possible causes of death.

Dr. Elkins testified that the only fracture she observed in the victim's skull was a broken nose. However, the victim had suffered at least three blows to the head in order to cause the damage she found. The front of the victim's face and the left side of his head were where the trauma was focused. She opined that "in this particular man, being in the condition that he was, . . . that kind of trauma could have been produced with kicking, stomping, something of that nature could very – could very likely have produced these injuries." She stated that she thought that, had the victim been hit with a heavy blunt object swung with force, there would have been skull fractures.

Dr. Elkins described the injuries to the victim's neck as consistent with manual strangulation involving a "sustained compressing force to both sides of the neck causing bilateral fractures, bilateral muscular hemorrhages."

Dr. Elkins estimated the time of the victim's death at between 5:40 p.m. on Saturday, August 25th and 5:40 a.m. on August 26th, but most likely occurring on the evening of August 25th. She further opined that the victim was dead before he was placed in his living room.

On cross-examination, Dr. Elkins acknowledged that the laceration on the victim's neck could have been caused by something other than a fingernail, for instance, by the toe of a boot or some other sort of blunt object. When questioned about whether the injuries to the victim's head could have been caused by a skillet, Dr. Elkins stated that she would have expected skull fractures in that event, and so, in her estimation, the injuries were caused by "something a little bit more delicate than that."

The State also put on view the person of Ms. Reilly during its case in chief. Ms. Reilly did not testify but was directed to stand in front of the jury and hold up her hands for the jury's viewing.

The Defendant offered the deposition testimony of Ola Rudder, his eighty-seven-year-old aunt. The Defendant lived next door to her, and she was familiar with the victim and Ms. Reilly because of the time they spent with the Defendant at his residence. She described the relationship between the victim and the Defendant as "friends." She stated that she was not aware of any arguments or problems between the two men. Ms. Rudder described the Defendant as "a good-hearted person, most good-hearted person I ever seen, do anything for you when he's sober, but [the Defendant] was drunk. He drinks heavy." When he drinks, she stated, the Defendant "would fight." She also stated that, of the Defendant, victim and Ms. Reilly, the Defendant was the only one who drove.

Ms. Rudder remembered seeing the victim at the Defendant's house on the day before his body was found. She was at the Defendant's house that day and saw the victim, the Defendant and Ms. Reilly there. The victim was drinking but was otherwise fine. The Defendant and Ms. Reilly were "pretty drunk." The Defendant had sold his washer and dryer to Ms. Rudder's niece. Ms. Rudder, the Defendant and Ms. Reilly went to the niece's house with a friend of Ms. Rudder's, who took the washer and dryer in her truck to the niece's house. The victim remained at the Defendant's house when they left. The delivery occurred in the early evening, and the niece paid the Defendant $200 cash for the appliances. The Defendant and Ms. Reilly then returned to the Defendant's house, and Ms. Rudder returned to hers.

Ms. Rudder stated that, on the way over to the niece's, the Defendant and Ms. Reilly were arguing because Ms. Reilly had said that she wanted to have sex with the victim. However, on the way back, the Defendant and Ms. Reilly had been "in the best of humor."

Ms. Rudder described the condition of the Defendant's house as "nasty." The electricity had been cut off. The Defendant had no phone but would borrow hers and take it to his house. She stated that the Defendant was packing up and trying to get rid of everything because the house was going to be foreclosed on. She remembered seeing skillets on a table in front of the couch.

Ms. Rudder stated that she went to bed at about 7:30 on that Saturday night and did not hear any fighting or anything coming from the Defendant's house that night. She did not see the Defendant again until the next afternoon after she returned from church. He drove up in his car and told her that he had borrowed her phone to make two or three calls and that he was going out to look for an apartment. She asked if the victim was with him, and the Defendant told her, no, that they had taken the victim home the night before. Ms. Reilly was also in the car but did not say anything. The Defendant returned the phone he had borrowed and then left.

Ms. Rudder explained that she had seen police cars pull up to the Defendant's residence several times in the past because he and Ms. Reilly were "drinking, arguing, fussing, wanting to fight."

Ms. Rudder spoke to the Defendant after his arrest. He told her that he and Ms. Reilly did not kill the victim and that the victim had been alive when they took him home. Ms. Rudder also received a letter from Ms. Reilly after her arrest in which Ms. Reilly likewise stated that she and the Defendant did not kill the victim.

Zoe Ammons also testified on behalf of the Defendant. She was a neighbor of the Defendant and Ms. Rudder. Ms. Ammons assisted in the delivery of the washer and dryer. She met the victim at the Defendant's house that day and stated that he had been drinking, as had been the Defendant and Ms. Reilly. She described the condition of the three people as "under the influence of alcohol . . . quite a great bit." While she was in the Defendant's house assisting in unhooking the appliances, she did not hear any arguments. The victim had been sitting upright on the couch and had been

wearing glasses. She did not interact with the victim but remembered him politely explaining that his health did not permit him to assist in removing the washer and dryer.

Ms. Ammons drove Ms. Rudder, the Defendant and Ms. Reilly to Ms. Rudder's niece's house while another friend followed in a truck with the washer and dryer. She stated that the Defendant and Ms. Reilly were arguing in the back seat about the victim during the drive. She did not remember the tone of any conversations on the way back to the Defendant's house. After they arrived back, she dropped the Defendant and Ms. Reilly off at the Defendant's house; she did not go back inside and did not see the victim again. She remembered returning to her home at 7:05 p.m. after having dropped them off a few minutes earlier.

Karen Carpenter also testified on behalf of the Defendant. She explained that she had known Ms. Reilly for two or three years, but met the Defendant only a few days before the victim's death. She had known the victim since 1998. She knew he was in bad health. She cleaned his house and visited with him. She stated that the victim drank a lot, was very weak, and had fallen on occasion in his home. She had once seen him fall and strike his head.

She stated that she had seen Ms. Reilly's hand "around a beer can" and that she had "average" fingernails. She also stated that she had no knowledge of any arguments or trouble between the Defendant and the victim.

The Defendant was charged with first degree premeditated murder. After hearing the foregoing evidence, the jury returned a verdict of guilt of second degree murder. The Defendant now appeals several of the trial court's evidentiary rulings, and challenges the sufficiency of the convicting evidence.

## EVIDENTIARY ISSUES

Initially the Defendant contends that the trial court erred in refusing to allow him to present Karen Carpenter's testimony about a fight she had with Ms. Reilly. Prior to trial, the State filed a motion in limine to exclude this proposed testimony. A brief hearing was held during which defense counsel argued that Ms. Carpenter would testify that, a few days before the victim's death, she was involved in a physical fight with Ms. Reilly during which Ms. Reilly "choked her almost into asphyxiation." Defense counsel argued that Ms. Carpenter could "testify as to the strength of Melinda Reilly and her propensity to do this type of thing," and that her testimony would be relevant "to show as an overall defense that someone else did this, and that in the process of doing it the way they did it, they tried the very same thing before on another victim." The trial court granted the State's motion, stating that Ms. Reilly "has been severed from this case. So she is not an accused, she is not a victim, and she is not a witness. And you're seeking to prove a character trait of a person who is not a party to this action. I don't see how -- I don't see how it's relevant." The Defendant now contends that the trial court's ruling was erroneous.

We are unable to address the merits of the Defendant's contention because there was no offer of proof made of Ms. Carpenter's testimony. We cannot determine whether a trial court's ruling as

to the admissibility of evidence is erroneous when we have no way of reviewing the contested evidence. Defense counsel's description of a witness's proposed testimony is not proof. This issue is waived for purposes of appeal because of the Defendant's failure to properly preserve the record. See State v. Hall, 958 S.W.2d 679, 691 n.10 (Tenn. 1997); State v. Goad, 707 S.W.2d 846, 853 (Tenn. 1986) (When excluded evidence "consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible."); Tenn. R. App. P. 36(a). The Defendant is therefore entitled to no relief on this ground.

Also prior to trial, the State filed a motion in limine to prohibit the Defendant from reading to the jury that portion of Ola Rudder's testimony in which she stated that, about three weeks prior to his death, the victim had told her that Ms. Reilly had threatened to hit him in the head with a skillet. The State objected to this testimony on the grounds that it was hearsay within hearsay. Defense counsel argued that the victim's hearsay statement qualified as an excited utterance under Tennessee Rule of Evidence 803(2). The trial court disagreed and ruled the testimony inadmissible.

We agree with the trial court that this evidence was not admissible. Initially, when testimony includes two levels of hearsay--he said that she said--both hearsay statements must satisfy an exception to the hearsay rule to be admissible. See Tenn. R. Evid. 805. An "excited utterance" admissible as an exception to the hearsay rule is "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). Ms. Rudder testified that the victim had called her from his house two to three weeks before his death and said to her, "you know what [Ms. Reilly] threatened to do to me?" Ms. Rudder asked him what, and he continued, "She threatened to hit me in the head with the iron skillet." No testimony about any of the circumstances surrounding this phone call was offered and the record contains no indication that the victim's statement was made while he was under the stress of any excitement caused by the alleged threat. Thus, the victim's statement was not shown to be admissible under this exception to the hearsay rule. Nor is Ms. Reilly's alleged statement to the victim admissible under any exception. The Defendant argues in his brief that, because she was "unavailable" due to her status as a co-defendant, see Tenn. R. Evid. 804(a)(1), Ms. Reilly's statement should be admissible as a statement against her penal interest. See Tenn. R. Evid. 804(b)(3). We disagree. The statement described did not subject Ms. Reilly to criminal liability. In sum, neither of the alleged statements by the victim or Ms. Reilly, as reported by Ms. Rudder, is admissible under an exception to the hearsay rule, and the trial court's ruling was therefore correct. This issue is without merit.

The Defendant also complains that the trial court erred in allowing the State to exhibit Ms. Reilly's person before the jury. Defendant first asserts that this presentation amounted to inadmissible hearsay. We disagree. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is further defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). The State's display of Ms. Reilly, including the showing of her hands to the jury, simply does not meet the definition of a "statement." This contention is without merit.

The Defendant also contends that Ms. Reilly's appearance before the jury constituted a violation of his constitutional right to confront witnesses against him, as set forth in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and State v. Ogle, 666 S.W.2d 58 (Tenn. 1984). We respectfully disagree. As recognized by our supreme court in the Ogle case, "Bruton . . . laid down the rule prohibiting the use of a non-testifying co-defendant's statement which incriminates the defendant." Ogle, 666 S.W.2d at 60. For instance, had Ms. Reilly issued a statement to the police in which she gave an eye-witness account of watching the Defendant beat and/or kick the victim to death, Bruton would prohibit the State's use of that statement at trial unless Ms. Reilly took the witness stand. In the instant case, however, the State made no use of any "statement" by Ms. Reilly in conjunction with displaying her to the jury. Rather, Ms. Reilly was, for all intents and purposes, an exhibit. The Defendant's theory of defense was that Ms. Reilly was responsible for the victim's death. In an effort to contest the Defendant's argument that Ms. Reilly had strangled the victim, the State wanted the jury to see Ms. Reilly's hands, particularly her fingernails, because Dr. Elkins had testified that the victim's neck bore an injury that might have been caused by a fingernail. The State's display of Ms. Reilly under these circumstances was no different than the State displaying an object that a defendant claims was the deadly weapon, where the State contends that the weapon did not have the capacity of causing the victim's fatal wounds. The trial court did not err in permitting the jury to view Ms. Reilly, and this issue is therefore without merit.

The Defendant next contends that the trial court erred in allowing Ms. Bell to testify as to what she overheard during her phone conversations with her sister. Initially, we note that the Defendant failed to make any contemporaneous objections to this testimony. The Defendant has therefore waived this issue. See Tenn. R. App. P. 36(a). Moreover, this testimony was admissible. Although the statements Ms. Bell overheard were clearly hearsay, see Tenn. R. Evid. 801, Ms. Bell testified that it was the Defendant's voice that she overheard. The statements were thus admissible as admissions. See Tenn. R. Evid. 803(1.2). That Ms. Bell identified the voice as belonging to the Defendant, in spite of the fact that she acknowledged never having spoken with the Defendant over the telephone, goes to the credibility of her identification, not its admissibility. This issue is without merit.[2]

## SUFFICIENCY OF THE EVIDENCE

The Defendant also challenges the sufficiency of the evidence in support of his conviction of second degree murder. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000);

---

[2]With respect to the Defendant's argument that the telephone calls were not properly authenticated, this issue is waived because the Defendant made no contemporaneous objection on this ground at trial. See Tenn. R. App. P. 36(a).

State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A "knowing" killing is committed when the accused was aware that his or her conduct with respect to the victim was reasonably certain to cause the victim's death. See id. § 39-11-302(b). Here, the proof established that the victim's killer(s) administered at least three strong blows to the victim's head, causing the formation of a lethal subdural hematoma. Additionally, the killer(s) manually strangled the victim with such compressive force as to fracture the victim's hyoid bone. The evidence showed that the injuries to the victim produced a significant amount of bleeding. Any person treating the victim in this way would be aware that such actions were reasonably certain to cause the victim's death. The Defendant argues, however, that his level of intoxication on the evening of the victim's death was such that he "could not have possessed the required culpable mental state." We acknowledge that a defendant's voluntary intoxication "is admissible in evidence if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a). Indeed, the jury in this case was instructed that if it found

> that the Defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then he cannot be guilty of the offense charged. If you are not satisfied beyond a reasonable doubt that the Defendant possessed the culpable mental state, then you must find him not guilty.

Nevertheless, the jury found that the Defendant did possess the required mental state of "knowing." Such a finding is within the fact-finder's province, and the evidence is certainly sufficient to support the jury's conclusion. Therefore, we will not overturn the jury's verdict on this ground.

The only remaining issue is the sufficiency of the evidence establishing the Defendant's identity as the perpetrator. A murderer's identity may be established through circumstantial evidence alone. See State v. Darnell, 905 S.W.2d 953, 961 (Tenn. Crim. App. 1995). In this case, we have

neither a confession from the perpetrator nor an eyewitness identification of the killer. We do have, however, abundant circumstantial evidence supporting the Defendant's identity as the victim's murderer. The Defendant admitted to having been with the victim on the evening of his death. The Defendant admitted to having "smacked" the victim on the victim's head. The victim's blood was found in the Defendant's house, in the Defendant's car, and on the Defendant's shoes. The Defendant admitted to having carried the victim to the victim's home. Medical testimony established that the victim was dead when he was placed on his living room floor. Ms. Bell testified to having heard the Defendant tell Ms. Reilly to end their phone call because Ms. Bell would "tell the police" and "turn them in." The Defendant left the scene of the crime and fled to Johnson City, many miles away.[3] The doctor performing the autopsy on the victim described injuries that were not consistent with the Defendant's explanation of how the victim came to be hurt. These injuries were consistent with kicking or stomping, not with being struck by a skillet. The Defendant's aunt testified that, when he was drunk, the Defendant "would fight." Finally, although the record before this Court does not contain a photograph or the vital statistics of Ms. Reilly, the jury was able to view her person and consider the likelihood of her inflicting the fatal injuries on the victim.

This evidence does not, of course, rule out the possibility that another person was also involved in the victim's death. It is, however, more than sufficient to establish the Defendant as one of the perpetrators of the victim's murder. As properly charged to the jury in this case,

> The [D]efendant is criminally responsible as a party to the offense of first-degree murder as charged or any of the lesser-included offenses if the offense was committed by the [D]efendant's own conduct, by the conduct of another for which the [D]efendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense. The [D]efendant is criminally responsible for an offense committed by the conduct of another if acting with the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense, the [D]efendant solicits, directs, aids, or attempts to aid another person to commit the offense.

See also Tenn. Code Ann. § 39-11-402(2). The evidence was more than sufficient to support the jury's conclusion that the Defendant, at a minimum, assisted in killing the victim. Accordingly, the Defendant's conviction of second degree murder is supported by sufficient evidence and this issue is therefore without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

---

[3]The victim was killed in Knoxville. A defendant's flight from the scene of a crime may properly give rise to an inference of guilt. See T.P.I.S Crim. 42.18; State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996).